U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| MIDWEST TERMINALS OF TOLEDO INTERNATIONAL, INC., 387 West Dussell Drive Toledo, OH  43537 | : : : : : | |
| Plaintiff, | : : | |
| | : | CASE NO.  2:18-cv-2660-JJH |
| v. | : : | JUDGE JEFFERY J. HELMICK |
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, Serve: Mr. Harrold A. Daggett International Longshoremen's Assn. 5000 West Side Avenue Suite 100 North Bergen, NJ  07047 | : : : : : : : : | **SECOND AMENDED COMPLAINT WITH JURY TRIAL DEMAND** |
| and | : : : | |
| INTERNATIONAL LONGSHOREMEN'S DIVISION – GREAT LAKES DISTRICT COUNCIL, | : : : : | |
| And | : : | |
| INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, LOCAL 1982 | : : : | |
| Defendants. | : | |

**PARTIES**

1.      Midwest Terminals of Toledo International, Inc. (hereinafter "Midwest" or "Plaintiff"), is a corporation organized and existing under the laws of the State of Ohio and has its principal office and place of business located in Maumee, Ohio, within the territorial jurisdiction of this Court.  Plaintiff is engaged in the stevedoring, loading, unloading and storage of waterfront cargo and its further distribution into interstate commerce.

2.    The International Longshoremen's Association ("ILA") is a labor union representing longshoremen workers along the East Coast of the United States and Canada, the Gulf Coast, the Great Lakes, Puerto Rico, and inland waterways.  The ILA has approximately 200 local affiliates in port cities in these areas.

3.    Defendant International Longshoreman's Division – Great Lakes District Council ("ILA Great Lakes") is a labor union representing longshoremen in the Great Lakes area and negotiates area agreements and enforces those contracts.

4.    Defendant International Longshoremen's Association Local 1982 ("ILA Local 1982") is an unincorporated labor organization whose authorized officers and agents were engaged in representing and/or acting for personnel at Midwest until January 3, 2018 when a majority of the bargaining unit employees signed a petition that they no longer wanted ILA Local 1982 to represent them and Midwest then withdrew recognition from ILA Local 1982.

5.    ILA, ILA Great Lakes and ILA Local 1982 are collectively referred to as "Defendants."

## JURISDICTION

6.    Jurisdiction is conferred on this Court pursuant to the provisions of Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187, 29 U.S.C. § 158(b)(4) and (e).  This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, relating to civil actions for damages arising "under the Constitution, laws or treatises of the United States," and 28 U.S.C. § 1337, relating to civil actions or proceedings "arising under any act of Congress regulating commerce."

7.    Defendant ILA is a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

8.     Defendant ILA Great Lakes is a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

9.     Defendant ILA Local 1982 is a "labor organization" within the meaning of Section 2(5) of the National Labor Relations Act, 29 U.S.C. § 152(5).

10.     Venue is appropriate in this Court in that the actions complained of took place within Lucas County of the Northern District of Ohio.

## FACTS

11.     Midwest operates a port at the mouth of the Maumee River.  Among other things, Midwest employs individuals to perform stevedoring activities.

12.     Midwest and ILA Local 1982 were parties to a Local collective bargaining agreement effective January 1, 2006 to December 31, 2010 (the "Local CBA").  The Local CBA has long since expired.  ILA Local 1982 was decertified on January 3, 2018 after a majority of the employees in the bargaining unit signed a petition that the employees no longer wanted ILA Local 1982 to represent them.

13.     Midwest and ILA Local 1982 were also signatory to a Collective Bargaining Agreement of the ILA Great Lakes and the Lakes Stevedore Employers.  This contract expired on December 31, 2012, was a voluntary contract that Midwest elected to terminate and not renew.

14.     Negotiations between Midwest and ILA Local 1982 to replace the expired Local CBA were unsuccessful.

15.     ILA Local 1982 had been a disfunctional union for many years.  Its history of disfunction was reported in a National Labor Relations Board case citation 289 NLRB 670 (1986).  This long disfunctional history went back decades into the 1950's and was a workforce

with divided factions as found by the Judge.  The divided factions and disruptions inside ILA Local 1982 were long before Midwest or its predessor were contractually hired to operate the Port at Toledo.  The companies just inherrited the workforce and its internal divisions.

16.    During the time Midwest has operated the Port at Toledo, Local 1982 has been placed into Trusteeship by the Defendant ILA twice.  The first Trusteeship was in 2010 and ended sometime in 2012 with the election of new ILA Local 1982 officers.

17.    The cause of action in the matter herein and the liabilities resulting therefrom started during the second time the ILA appointed its agents to run ILA Local 1982.

18.    On May 24, 2016, William R. McNamara (ILA V.P.) recommended to Harold Daggett (ILA Pres.) that Local 1982 be placed in Trusteeship because, amongst other things, Local 1982 had no money in the treasury, it currently owed its law firm $15,000 and would most likely be required to pursue additional litigation.  A true and accurate copy is attached hereto as Exhibit A.

19.    McNamara requested that William Yockey (ILA V.P.) be appointed as a Trustee.

20.    Yockey is a Vice-President of the ILA, and therefore, was an agent acting on behalf of the ILA throughout his time as Trustee for Local 1982, including the unlawful actions set forth in this Second Amended Complaint.  See also, Roster of ILA Executive Council (https://ilaunion.org/ila-executive-council/) listing Yockey as an ILA V.P. attached hereto as Exhibit B.

21.    On August 29, 2016, Yockey sent correspondence to Daggett requesting that Local 1982 be placed in Trusteeship.  The correspondence was on letterhead identifying Yockey as an ILA V.P.  A true and accurate copy is attached hereto as Exhibit C.

22.     Subsequently, on September 26, 2016 Daggett ordered a hearing regarding Yockey's request for the imposition of Trusteeship.  A true and accurate copy is attached hereto as Exhibit D.

23.     On November 11, 2016, Virgil Maldonado (ILA V.P.) sent correspondence to Daggett enclosing the Committee Report and Recommendations related to the hearing.  The Committee recommended that that Local 1982 be placed in Trusteeship.  A true and accurate copy is attached hereto as Exhibit E.

24.     Accordingly, on November 21, 2016 Daggett placed Local 1982 in Trusteeship and appointed Yockey as Trustee "to immediately take charge and control of the books, records, property, assets, funds and affairs."  In his correspondence, Daggett recognized Yockey as an ILA V.P.  A true and accurate copy is attached hereto as Exhibit F.

25.     On December 2, 2016 appointed Mike Baker (V.P., Atlantic Coast Dist.) as Co-Trustee.  A true and accurate copy is attached hereto as Exhibit G.


26.     Upon informtion and belief, from December of 2016 to the present, ILA Local 1982 has been run by and through the ILA via President Daggett's appointment of Yockey (ILA V.P.) a and M. Baker, ecretary Treasure of ILA Great Lakes.  Both Yockey and M. Baker ran ILA Local 1982 as agents of the ILA and the ILA Great Lakes and all three entities are jointly and severally liable for any damages caused by these gentlemen acting as their agents in this lawsuit.

27.     On December 2, 2016, Mr. Yockey formally advised Plaintiff that the ILA had placed ILA Local 1982 into Trusteeship and "all officers and have been removed from office and no longer have authority in the affairs of the Local" and that total control of Local 1982 now

rested with Mr. Yockey for "all future matters between Midwest Terminals Inc. and ILA Local #1982." The letterhead on the correspondence identifies Yockey as an ILA Vice President. A true and accurate copy is attached hereto as Exhibit H.

28.     On December 16, 2016, Yockey formally advised Midwest that Mr. Michael Baker, Secretary Treasure of the ILA Great Lakes, acting as the ILA Great Lakes agent, was the only other Trustee appointed by ILA to run ILA Local 1982. As the letter states. "Mr. Michael Baker and I are the only officials of the Union, and We alone represent the Union…" A true and accurate copy is attached hereto as Exhibit I.

29.     On January 25, 2017, Yockey sent correspondence to Plaintiff and again stated that he and M. Baker were in charge of ILA Local 1982 and they alone ran the operation. A true and accurate copy is attached hereto as Exhibit J.

30.     On February 1, 2018, Yockey sent an e-mail to Jim Paylor (ILA Assistant General Organizer ILA), Mike Baker (Co-Trustee) and John Baker, Jr, (Pres. Great Lakes Dist. Council) attaching a Local 1982 Trusteeship Report to be submitted to Daggett. The subject line of the e-mail is titled "Send Lawyers Guns and Money." A true and accurate copy is attached hereto as Exhibit K.

31.     On May 1, 2018, Co Trustees Yockey and Mike Baker held a meeting with the Local 1982 membership. The meeting minutes authored by Baker specifically state that the "International and GLDC [Great Lakes District Council] have been helping the Local financially pay for the [l]egal bills that have occurred due to fighting Midwest Terminals." A true and accurate copy is attached hereto as Exhibit L.

32.     Further, the minutes noted that "18 month Trusteeship is about to expire at the end of May and [Yockey] was trying to get an extension from the International since there are so many outstanding NLRB charges and other battles that the Trustees are still fighting."  Id.

33.     On October 31, 2018, Paylor sent e-mail correspondence to numerous ILA affiliated persons noting that Trustee Yockey has been supported by the International and GLDC in its ongoing fight against Midwest and calling on various other locals and Districts to donate money so Yockey can continue picketing against Midwest and for his legal expenses.  A true and accurate copy is attached hereto as Exhibit M.

34.     Finally, April 10, 2019 meeting minutes of an ILA Local #1982 Union Meeting held on April 9, 2019 noted that the Local only had $693.00 in its account.  A true and accurate copy is attached hereto as Exhibit N.

35.     As Trustees, Yockey and M. Baker controlled ILA Local 1982.

36.     They acted as agents of the ILA and the ILA Great Lakes who oversaw could control the actions of ILA Local 1982.

37.     The ILA and the ILA Great Lakes planned, institgated and independently participated in Local 1982's illegal conduct.

38.     Accordingly, the ILA and the ILA Great Lakes are jointly and severally liable for the unlawful conduct in violation of the Secondary Boycott of § 8(b)(4) and/or § 8(e) of the Labor Management Relations Act ("LMRA" or "Act") and for which damages are allowed under the LMRA.

39.     Further, because Yockey and M. Baker were also acting on behalf of ILA Local 1982, it is also jointly and severably liable for the same damages that these Trustees created during their tenure.

40.    Yockey and M. Baker assertedthat theywere the only people in charge of Local 1982 and neither the ILA nor ILA Great Lakes can assert any defense that they are not jointly and severally liable for the actions of ILA Local 1982.

41.    The ILA and the ILA Great Lakes independently participated in, authorized, ratified, were the agents of ILA Local 1982 and engage in conduct that they would be liable for with respect to any of the unlawful conduct performed on behalf of or in the name of ILA Local 1982 and, as such are not shielded from liability.

42.    Yockey and M. Baker were in charge of ILA Local 1982 and they who planned, participated in, authorized, ratified, were the agents of and engaged in conduct that makes the ILA and ILA Great Lakes liable with respect to all the unlawful conduct performed on behalf of or in the name of ILA Local 1982.

43.    Before the ILA placed ILA Local 1982 into Trusteeship and subsequently appointed Yockey and M. Baker as Co-Trustees, shipping companies whose ships delivered cargo to Midwest advised Midwest the that they were receiving threats from the President of ILA Great Lakes, John D. Baker Jr., who was also speaking on behalf of then  ILA Local 1982 President, Otis Brown, that the shipping companies could expect labor trouble if their ships docked at the Toledo Port, the facility operated by Midwest.

44.    On March 28, 2013, in response to said threats, Midwest wrote a letter to both the Presidents of ILA Local 1982 and ILA Great Lakes, that such threats were unlawful and if any ships experienced labor trouble, Midwest would sue the Unions under the law to recover its damages.  A true and accurate copy is attached hereto as Exhibit O.

45.    Neither Local 1982 nor the ILA Great Lakes responded to Plaintiff's correspondence.

46.     Nevertheless, Midwest stopped receiving any complaints from the Shipping Companies that they were being threatened with labor trouble if they docked at Midwest's facility.

47.     Labor peace against the Shipping Companies lasted from March 28, 2013 to approximately for 4 years therafter.

48.     In 2017, ILA Local 1982 – under the direction and control of Yockey and M. Baker –changed its tactics.  Specifically, on or about April 25, 2017, the Defendants begain a plan of action against the Shipping Companies who were delivering cargo to Midwest facility.

49.     The Defendants, through Yockey and/or M. Baker entered into an explicit or implied agreement with the LPA and the Pilots to unlawfully coordinate with the Defendants to have the Pilots stop providing shipping services to the neutral shipping companies when ships either entered or left the Toledo Port.

50.     The above agreement was at the control and direction of the Defendants.

51.     The Lakes Pilots Association, Inc. (hereinafter "LPA") is the Company that supplies Pilots to navigate International Ships through the Great Lakes for docking at Midwest's facility.   LPA is incorporated in the State of Michigan and provides professional pilotage services to ships navigating the waters of Lake Erie as well as the Detroit and St Clair river system, along with all of the associated ports.

52.     The LPA Pilots are Independent Contractors and are hired by the shipping companies Independent Contractors to do a specific job duty – comply with Coast Guard regulations, by moving the ships on the Great Lakes and when instructed to, in to and out of the ports.

9

53.     The Pilots who LPA refers to International shipping companies are not employees of the LPA.  They are self-employed independent contractors who run their own independent businesses as individual Pilots.

54.     LPA Pilots are not "employees" as defined by the National Labor Relations Act. They specifically excluded from the coverage of that statute.   Section 2(3) of the Labor Management Relations Act in relevant part states:

> The term "employee" shall include any employee, and shall not be limited to the employees of a particular employer, **unless the Act [this subchapter] explicitly states otherwise,** and shall include any individual whose work has ceased as a consequence of, or in connection with, any current labor dispute or because of any unfair labor practice, and who has not obtained any other regular and substantially equivalent employment, **but shall not include** any individual employed as an agricultural laborer, or in the domestic service of any family or person at his home, or any individual employed by his parent or  spouse,  **or any individual having the status of an independent contractor, or any individual employed as a supervisor**,….

55.     Therefore, under this statute, the LPA itself is a company containing only supervisors and the LPA Pilots are without question Independent Contractors who are specifically excluded from coverage of the National Labor Relations Act.

56.     Accordingly, the Pilots had no right or protection under Section 7 of the National Labor Relations Act to honor any so-called ILA Picket as they have no rights under the LMRA.

57.     Pursuant to the Natioal Labor Relations Act, 29 U.S.C. § 151–169, the International Shipping Companies and the companies who pay them to have their cargo picked up or delivered to the Midwest Port at Toledo, are neutral parties to any labor dispute between Plaintiff and the Defendants.

58.     It is unlawful for the Defendants to coordinate with the LPA Pilots in order that the Pilots cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any International Shipping Company.

10

59.     It is a further violation of the law for the Defendants, under the direction and control of Mr. Yockey M. Baker to use their own members' picketing to engage conduct with an object of forcing or requiring an employer to cease doing business with another employer.

60.     The ILA Local 1982 pickets unlawfully intended as an object to stop the Pilots from either docking the international ships or allowing those ships to leave the Toledo Port in order to force or require the International Shipping Companies to stop doing business with Midwest.

61.     Midwest does not hire the Pilots.

62.     ILA Locla 1982 does not allege – nor has it ever alleged – that the Pilots were performing ILA work.

63.     The Pilots are hired by the neutral International Shipping Companies.

**April 25, 2017**

64.     On April 25, 2017, ILA Local 1982 on behalf of all of the Defendants prevented one ship owned by FedNav, the largest International Shipping Company headquartered in Canada, from leaving the dock operated by Midwest and prevented another ship owned by FedNav from docking its ship at the dock operated by Midwest.

65.     To give an excuse and false appearance of legitimacy, per the express or implied agreement, ILA Local 1982 set up "pickets" about a mile away from the Midwest dock for the sole purpose to give the Pilots an excuse not to move the ships.

66.     All Midwest employees, even ILA Local 1982 members, crossed this fake "picket."

67.     However, the LPA Pilots refused to board the ships or dock the ships while this "picket" was ongoing per the express or implied agreement with the Defendants.

68.     LPA was in direct contact with ILA Local 1982, which coordinated their "picketing" to coincide with the refusal of the Independent Contractor Pilots from moving their ships in and out of the Midwest dock.

69.     This action was also aimed at the Shipping Companies as a warning to them this could continue and for them to stop doing business with Midwest.

70.     This action resulted in damages to Midwest.

71.     The picket was unlawful because it was not directed to Midwest, was not even close to Midwest's main gate entrance, and was intended to emesh numerous private companies who were not involved in the labor dispute between the Defendants but they were all required to "cross" this so called picket line for their employees to go to work.

**April 27, 2017**

72.     On April 27, 2017, Yockey, on behalf of the Defendants, attended a meeting with the Toledo-Lucas County Port Authority (hereinafter "Port Authority"), where he admitted that ILA Local 1982 had blocked the ships at the Midwest Port, that his goal was to have these neutral shipping companies abandon the cargo at Midwest.

73.     Because the LPA Pilots had to be coordinated with the Defendants to stop the ships, his statement was an admission that the Pilots had an express or implied agreement that they would refuse to handle International Shipping and process their cargo under Yockey's control and on behalf of the Defendants.

74.     The plan was simple – the Defendants gave the signal picketing to the LPA Pilots who then blocked the ships from leaving or entering the dock.

75. Yockey also unlawfully threatened Midwest and the Port Authority that the Defendants would engage in additional coordinated actions with the LPA Pilots to stop future ships.

76. Yockey's stated intent at this meeting was to force or require these International Shipping Companies and their Midwest customers, whose cargo were on those ships, to stop doing business with Midwest.

77. Yockey's action violated the law pursuant to the Hot Cargo agreement express or implied that the LPA Pilots had agreed not to pilot the International Ships or deliver their cargo.

78. Yockey's action also violated the law pursuant to Secondary Picketing because the object of the picketing was to stop the neutral companies from doing business with Midwest.

79. The Defendants knew and understood that the intent of their actions were to force or require these Shipping Companies and their customers businesses whose cargo they carried to stop doing business with Midwest.

80. Thus, since the Defendants are not licensed Pilots allowed by the Coast Guard to operate ships, the only way Yockey could declare that he can stop future ship movement is based upon an express or implied agreement with the Defendants and the LPA Pilots that the ships do not move until the Defendants say they move.

81. Accordingly, Yockey's declaration that he will decide when ships move into and out of the Midwest Port can only be possible if there was an express or implied agreement that the LPA Pilots would refuse to move ships for the neutral shipping companies on the basis of what the Defendants tell them to do.

82. This action resulted in damages to Midwest.

**October 26, 2017**

83.    On or about October 26, 2017, the express or implied agreement continued between the Defendants and the LPA Pilot who stopped performing work for another shipping company and the Pilot refused to move a ship at Midwest's dock.

84.    The Defendants knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

85.    This action resulted in damages to Midwest.

**November 7, 2017**

86.    On or about November 7, 2017, the express or implied agreement continued between the Defendants and with the LPA Pilot who refused to move a ship at Midwest's dock.

87.    In an effort to resolve the LPA Pilots refusal move ships Midwest set up a reserved gate system with a specific gate designated for the ILA Local 1982 picket and others, and a second gate for neutrals like the LPA Pilots and the Shipping Companies.

88.    Neither the ILA Picket nor the LPA Pilots recognized the reserved gate system.

89.    The picket line was erected shortly before the Pilot arrived.

90.    No other ILA members honored the picket line.

91.    No Midwest employees honored the so called "picket."

92.    The only person(s) who honored the "picket" was the LPA Pilot under the unlawful express or implied agreement with the Defendants.

93.    The Defendants knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

94.    This action resulted in damages to Midwest.

14

**Novermber 22, 2017**

95.     On or about November 22, 2017, the express or implied agreement continued between the Defendants and the LPA Pilot who refused to move a ship at Midwest's dock by once again the abrupt appearance of a "picket."

96.     The Pilot used the "picket" as an excuse to stop work.

97.     The Defendants knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

98.     This action resulted in damages to Midwest.

**April 8, 2018**

99.     On or about April 8, 2018 the express or implied agreement continued between the Defendants and the LPA Pilots who refused to move a ship at Midwest's dock using the standard excuse of the so-called "picket."

100.    Again, the "picket" was nowhere near Midwest's property.

101.    The Defendants also exercised a new illegal tactic – a boat in the water a long distance from the dock.

102.    The Defendants engaged in water picketing directly at the ships coming into the waters of the river.

103.    The Defendants targeted a neutral ship in the open water in order to get the ship to stop doing business with Midwest.

104.    This action was a signal to the Pilots to turn their ships around and not dock at Midwest's facility or to refuse to move the ships from Midwest's facility.

15

105.    Yockey, acting on behalf of the Defendants, used his pontoon boat to go out onto these waters and "picket" neutral ships and he did so when an International ship was coming into the river both day and night, or when a ship was scheduled to depart the dock.

106.    While engaging in water picketing from his pontoon boat, Yockey contacted the ships via radio and talked to the Pilots about the water picket to ensure the Pilots refused to cross the water picket and abide by their agreement

107.    The Defendants knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

108.    This action resulted in damages to Midwest.

**May 2, 2018**

109.    On or about May 2, 2018 the express or implied agreement continued between LPA and ILA Local 1982 and the LPA Pilot who refused to dock a ship at Midwest's dock.

110.    The Pilot then moved the ship out of the channel and departed the area to the Northeast back into Lake Erie.

111.    The ship did not return until the following day, May 3, 2018.

112.    When it did return, the Pilot once again refused to dock the ship.

113.    Upon information and belief, under Coast Guard regulations, the Captain of the ship took control of the ship and called for tugs to dock the ship.

114.    The tugs arrived and docked the ship.

115.    After the ship was unloaded and scheduled for departure on May 6, 2018, the Pilot refused to move the ship.

116.    Again, the so-called picket was the excuse even though nobody at Midwest, including the ILA members, recognized the picket as legitimate.

117.    Throughout this time period the water picket was also used an excuse not to move ship.

118.    The Defendants knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

119.    This action caused damage to Midwest.

**May 10, 2018**

120.    On or about May 10, 2018, the express or implied agreement continued between the Defendants and the LPA Pilot who refused to move a ship from Midwest's dock.

121.    Consequently, there were now two ships docked at Midwest's facility that had been unloaded but not moved from the dock.

122.    Both the unlawful land and water picketing continued and was used by the Pilots not to move these ships.

123.    The Defendants, the LPA and the LPA Pilot knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

124.    This action resulted in damages to Midwest.

**May 12, 2018**

125.    On or about May 12, 2018, the express or implied agreement between All ILA Defendants and the LPA Pilot continued.

126.    Upon information and belief, at some time later that night and at the direction of the Defendants, the LPA Pilot docked the ship at Midwest's facility with the specific intention not to allow that ship to leave.

127.    Both the unlawful land and water picketing continued and was used by the Pilots as an excuse not to move these ships.

128.    Consequently, after the ship was unloaded, the LPA Pilot refused to move the ship form Midwest's dock.

129.    Accordingly, three ships were now docked at Midwest's facility that had been loaded but not moved.

130.    The Defendants, the LPA and the LPA Pilot all knew and understood that the intent of their actions were to force or require these International Shipping Companies and their cargo companies who had contracts with Midwest to stop doing business with Midwest.

131.    This action resulted in damages to Midwest.

132.    On May 13, 2018, Yockey on behalf of the Defendants boasted in a Press Release that the labor dispute with Midwest was with the "International Longshoremen's Association" and that there were "three foreign flag vessels trapped in the Port for over a week."

133.    The only way these ships could be "trapped" in the Toledo Port was by an express or implied agreement between the Defendants and the Lake Pilots exactly as Mr. Yockey had predicted as early as April 27, 2017, a year prior.

134.    The Defendants are not licensed Pilots allowed by the Coast Guard to operate ships as Pilots.  As such, the only way that Yockey can declare that ship movement is based upon what the ILA says, is if there is an express or implied agreement with the Defendants and the

LPA Pilots that the ships do not move until the ILA says they move. A true and accurate copy is attached hereto as Exhibit P.

135. Upon information and belief, these ships were blockaded at the Midwest Port for approximately two weeks before Midwest and the shipping companies were able to secure permission from the Coast Guard to have the ships moved without a Pilot.

136. During this time period, the Defendants indefinitely held hostage the International Ships coming into the Midwest dock, that under Coast Guard regulations, could not be moved without a Pilot.

137. Thus, as a direct result of the Defendants actions of blockading the Toledo Port and preventing the International Shipping Companies from moving their ships at a fear of a tremendous cost, Midwest lost all international Shipping Business from that point until the Coast Guard prohibited Great Lakes Pilots from coordinating with the Defendants to stop interstate commerce.

138. From early May 2018 until the first International Ship arrived on or about October 2, 2018, Midwest suffered massive amounts of damages.

139. In addition, many International Shipping Companies and their cargo business customers contracted with other Ports for the delivery of their products.

## COUNT I

### Violation of Hot Cargo Agreement Prohibition
### Under The Labor Management Relations Act

140. Midwest hereby restates and alleges all of the paragraphs 1 through 139 above as if fully set forth here.

141. Section 8(e) of the Act provides that "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied,

whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer…"

142.    As set for above the LPA and the Independent Contractor Pilots as "companies" and the  Defendants as the "union" had entered into an agreement either express or implied that the LPA and the Independent Contractor Pilots would stop working for the International Shipping Companies upon a signal picket from the ILA.

143.    This agreement to stop handling the International Shipping Company vessels and to follow the standard protocol of docking or showing up to move the ship out of the dock was a violation of the statute and it treated these ships and the cargo they carried as "Hot Cargo" in violation of Section 8(e) of the Act.

144.    It also is a violation of Section 8(b)(4) of the Act that prohibits any agreement in violation of Section 8(e).

145.    Under Section 303 of the Act, any violation of Section 8(b)(4) entitles Midwest to money damages for its losses from a Labor Organization only.

146.    Therefore, by the express or implied agreement by the private Employer LPA and the Independent Contractor self-employed LPA pilots had with the Defendants that they would honor a signal picket and refuse to handle the International Shipping Companies vessels or the cargo inside, the Defendants have violated the Hot Cargo prohibitions of the LMRA.

147.    As a direct result, Midwest suffered massive damages.

## COUNT II

### Violation of Secondary Picketing Under The
### Labor Management Relations Act

148.    Midwest hereby restates and alleges all of the paragraphs 1 through 147 above as if fully set forth here.

149.    Under Section 8(b)(4) of the LMRA it is a violation of the law for a Union to picket with the objective to have neutral secondary companies cease doing business with the Company that the Union has the primary dispute.

150.    As declared as early as April 27, 2017 by Yockey, the Defendants had stopped the FedNav ships on April 25, 2017 and he would do it again.

151.    The Defendants wanted the International Shipping Companies to stop delivering their Cargo to Midwest and wanted that Cargo abandoned as Yockey expressly stated that his objective for the picketing of Midwest was to have the International Shipping Companies and the Companies whose cargo they carried stop doing business with Midwest.

152.    Yockey and the Defendants achieved that goal.

153.    In doing so they had to violate the Secondary Picketing prohibitions of the LMRA.

154.    Under Section 303 of the Act, any violation of Section 8(b)(4) entitles Midwest to money damages for its losses from a labor Organization only.

155.    By engaging in Secondary Picketing with the specific intent to have the LPA pilots honor a signal picket with the specific objective of the International Shipping Companies and the Companies whose cargo was carried inside the ships and were contractually under contract with Midwest to refuse to do business with Midwest, the Defendants have violated the Secondary Picketing prohibitions of the LMRA.

156.    As a direct result, Midwest suffered massive damages.

WHEREFORE, the Plaintiff prays for the following relief:

1.  That Defendants ILA, ILA Great Lakes and ILA Local 1982 individually be found to have jointly and severally violated the prohibitions of Hot Cargo agreement provision

of the LMRA.

2. That Defendants ILA, ILA Great Lakes and ILA Local 1982 individually be found to have jointly and severally violated the prohibition of the Secondary Picketing provision of the LMRA.

3. That this Court award damages against the ILA, ILA Great Lakes and ILA Local 1982 individually in an amount according to proof.

4. That the Court award pre-judgment interest.

5. That the Court award reasonable attorney fees and costs as provided under the statute.

6. That the Court order further relief as deemed just and proper.

Respectfully submitted,

*/S/ Ronald L. Mason*

Ronald L. Mason (0030110) (Trial Attorney)
Aaron T. Tulencik (0073049)
Mason Law Firm Co., L.P.A.
P.O. Box 2160
Westerville, OH 43086
T: 614.734.9450
F: 614.734.9451
Email: rmason@maslawfirm.com
         atulencik@maslawfirm.com

*Counsel for Plaintiff*

## JURY DEMAND

Plaintiff demands a trial by jury for all issues Plaintiff is entitled.

Respectfully submitted,

*/S/ Ronald L. Mason*

Ronald L. Mason (0030110) (Trial Attorney)
Aaron T. Tulencik (0073049)
Mason Law Firm Co., L.P.A.
P.O. Box 2160
Westerville, OH 43086
T: 614.734.9450
F: 614.734.9451
Email:     rmason@maslawfirm.com
              atulencik@maslawfirm.com

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the Plaintiff's Second Amended Complaint was filed electronically with the Clerk of Court on January 18, 2020 using the CM/ECF system.  The CM/ECF system will serve notice of filing upon all parties registered to receive service via this system.

/s/ Aaron Tulencik
Aaron Tulencik (0073049)