UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Midwest Terminals of Toledo
International, Inc.,

                Plaintiff,

      v.

International Longshoremen's
Association, *et al.*,

                Defendants.

Case No. 3:18-cv-2560

MEMORANDUM OPINION
AND ORDER

## I. INTRODUCTION

Defendants the International Longshoremen's Association, ALF-CIO ("ILA"), the International Longshoremen's Division – Great Lakes District Council ("GLDC"), and the International Longshoremen's Association, Local 1982 (collectively, "Defendants"), have filed motions to dismiss Plaintiff Midwest Terminals of Toledo International, Inc.'s Second Amended Complaint. (Doc. Nos. 75 and 77). Midwest filed a brief in opposition to the motions to dismiss, (Doc. No. 81), and Defendants filed briefs in reply. (Doc. Nos. 85 and 87).

Midwest subsequently filed a motion for leave to file a Third Amended Complaint, seeking to add additional defendants and another claim. (Doc. No. 83). The GLDC and Local 1982 filed a brief in opposition to Midwest's motion. (Doc. No. 88). Midwest filed a brief in reply. (Doc. No. 91). The ILA does not oppose Midwest's motion for leave but reserves its right to answer or otherwise respond to the Third Amended Complaint if leave is granted. (Doc. No. 86).

The ILA also filed a motion to strike Midwest's demand for attorney fees. (Doc. No. 76). Midwest acknowledges it cannot recover attorney fees in this action and does not oppose the ILA's motion to strike. (Doc. No. 81 at 3 n.2).

For the reasons stated below, I grant the ILA's motion to strike, as well as Defendants' motions to dismiss, and deny Midwest's motion for leave to amend.

## II.    BACKGROUND

Midwest initiated this litigation on November 6, 2018, alleging that, between 2017 and October 2018, the Defendants unlawfully conspired with the professional ship pilots ("Pilots") of the Lakes Pilot Association, Inc. ("LPA"), to prevent ships owned or operated by international shipping companies from navigating to or from the Toledo Port operated by Midwest. (Doc. Nos. 1 and 64). Professional ship pilots, including the Pilots associated with the LPA, are authorized by federal law to operate in local waterways and apply detailed knowledge of local conditions to navigate international, ocean-going vessels on Lake Erie and its connected river systems. (*Id.* at 9); *see also* 46 C.F.R. Part 401 *et seq.* The Pilots are independent contractors who perform work on behalf of the LPA. (Doc. No. 64 at 9-10).

Midwest alleges, among other things, that the Defendants improperly set up a picket line designed to provide an excuse for the Pilots to refuse to board and navigate the ships, and that the Defendants improperly conspired with the Pilots to ensure the Pilots went along with the picket. (*Id.* at 9-19). At the time, ILA Local 1982 had been placed in a trusteeship by ILA President Harrold Daggett; the trusteeship order removed local officers from their positions and located "control of the books, records, property, assets, funds[,] and affairs" under the sole authority of two trustees – William Yockey, International Vice President of the ILA, and John Baker, Jr., International Vice President of the ILA and President of the ILA Great Lakes. (*Id.* at 4-5).

2

Midwest asserts the Defendants violated the prohibitions in the Labor Management Relations Act ("LMRA") against agreements to refrain from handling certain products and against secondary picketing. (*Id.* at 19-21). The ILA, the GLDC, and Local 1982 have filed motions to dismiss Midwest's claims. (Doc. Nos. 75 and 77).

### III. MOTIONS TO DISMISS

#### A. STANDARD

Rule 12 provides for the dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A court must accept as true all of the factual allegations contained in the complaint when ruling on a motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). To survive a motion to dismiss under Rule 12(b)(6), "even though a complaint need not contain 'detailed' factual allegations, its 'factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland, Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted).

The plaintiff must offer more than conclusory allegations or legal conclusions masquerading as factual allegations. *Twombly*, 550 U.S. at 555 (The complaint must contain something more than "a formulaic recitation of the elements of a cause of action."). A complaint must state sufficient facts which, when accepted as true, state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully" and requires the complaint to allow the court to draw the reasonable inference that the defendant is liable for the alleged misconduct).

Courts must read Rule 12(b)(6) in conjunction with Rule 8(a)(2)'s requirement that a plaintiff need offer "only 'a short and plain statement of the claim showing that the pleader is entitled to

3

relief.' Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson*, 551 U.S. at 93 (citing *Twombly*, 550 U.S. at 555); *see also Sensations, Inc. v. City of Grand Rapids,* 526 F.3d 291, 295-96 (6th Cir 2008). The court "may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case[,] and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

### B.   MIDWEST'S CLAIMS

Midwest's Second Amended Complaint contains two claims: (1) violation of the prohibition on hot cargo agreements found in Section 8(e) of the LMRA ("Count I"); and (2) secondary picketing in violation of Section 8(b)(4) of the LMRA ("Count II"). (Doc. No. 64 at 19-21).

#### 1.   Count I

Section 8(e) states "[i]t shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains[,] or agrees to cease or refrain[,] from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person . . . ." 29 U.S.C. § 158(e). The agreements § 8(e) prohibits are known as "hot cargo" agreements. *Nat'l Woodwork Mfrs. Ass'n v. N.L.R.B.*, 386 U.S. 612, 634 (1967).

The ILA argues that Midwest fails to state a plausible claim for relief in Count I because Midwest has not alleged the existence of an unlawful hot cargo agreement. The ILA first contends "Section 8(e) is only intended to apply to 'contracts or agreements' between unions and their employers, generally, if not always, in the form of clauses or provisions in collective bargaining agreements." (Doc. No. 75-1 at 12).

4

Midwest disagrees with the ILA's characterization of § 8(e)'s coverage. In its view, "the plain language of the statute states that the agreement may be *express or implied*." (Doc. No. 81 at 6); (*see also id.* at 7 ("'It is also worth noting that the law does not require a written contract; the statute specifically references "any contract or agreement, express or implied."'" (quoting *Am. Steel Erectors, Inc. v. Loc. Union No. 7, Int'l Ass'n of Bridge, Structural, Ornamental & Reinforcing Iron Workers*, 536 F.3d 68, 83-84 (1st Cir. 2008) and 29 U.S.C. § 158(e)))). Therefore, Midwest contends, its allegation that "Defendants, through Yockey and/or M. Baker entered into an explicit or implied agreement with the LPA and the Pilots to unlawfully coordinate with the Defendants to have the Pilots stop providing shipping services to the neutral shipping companies when ships either entered or left" Midwest's facilities, (Doc. No. 64 at 9), is sufficient to state a plausible claim for relief under § 8(e).

Midwest is correct; the plain language of § 8(e) would seem to encompass the agreement it alleges existed between Defendants and the Pilots. But the Supreme Court repeatedly has made clear that § 8(e)'s "sweeping" statutory language is not to be taken at face value. *Nat'l Woodwork*, 386 U.S. at 635. For more than 50 years, the Supreme Court has reiterated that § 8(e) "must be interpreted in light of the statutory setting and the circumstances surrounding its enactment[,]" in line with the "'familiar rule[ ] that a thing may be within the letter of the statute and yet not within the statute, because not within its spirit nor within the intention of its makers.'" *Connell Constr. Co., Inc. v. Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 628 (1975) (quoting *Nat'l Woodwork*, 386 U.S. at 619) (further citation omitted).

In line with this guidance, the Supreme Court has stated "Section 8(e) . . . makes it an unfair labor practice, with provisos, for unions and employers to enter into <u>collective-bargaining contracts</u> whereby the employer ceases or agrees to cease doing business with any other person." *N.L.R.B. v. Enter. Ass'n of Steam, Hot Water, Hydraulic Sprinkler, Pneumatic Tube, Ice Mach. & Gen. Pipefitters of New York & Vicinity, Loc. Union No. 638*, 429 U.S. 507, 517 (1977) (emphasis added); *see also N.L.R.B. v.*

5

*Int'l Longshoremen's Ass'n, AFL-CIO*, 447 U.S. 490, 503-04 (1980) ("Section 8(e) makes unlawful those <u>collective-bargaining agreements</u> in which the employer agrees to cease doing business with any other person.") (emphasis added).

Midwest's citation to *Am. Steel Erectors* (a First Circuit case which failed to mention – much less distinguish – these binding interpretations of § 8(e)) does not provide a legal basis to shoehorn the facts Midwest alleges into a plausible § 8(e) claims. (*See* Doc. No. 81 at 7). Further, its repeated assertion that Defendants had an "express or implied agreement" with the Pilots, (*see, e.g.,* Doc. No. 64 at 12, 14), is a legal conclusion, not a factual allegation, and therefore it is not entitled to a presumption of truth. I conclude Midwest fails to plausibly allege the existence of an unlawful hot cargo agreement and grant Defendants' motions to dismiss as to Count I.[1]

### 2. Count II

In Count II, Midwest alleges Defendants violated 29 U.S.C. § 158(b)(4)(i) and (ii)(B) by engaging in picketing "with the objective to have neutral secondary companies cease doing business" with Midwest. (Doc. No. 64 at 20-21; Doc. No. 81 at 9). Midwest further alleges that, by engaging in picketing with this intent, Defendants violated "the Secondary Picketing prohibitions of the LMRA." (Doc. No. 64 at 21).

Section 8(b)(4) provides, in part that "[i]t shall be an unfair labor practice for a labor organization or its agents –

> (4)(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is –

---

[1] In Count I, Midwest also alleges "[i]t also is a violation of Section 8(b)(4) . . . that prohibits any agreement in violation of Section 8(e)." (Doc. No. 64 at 20). Because I have concluded Midwest fails to plausibly allege the existence of a prohibited hot cargo agreement, I also conclude Midwest fails to state a claim for violation of § 8(b)(4) based upon that alleged agreement.

> . . .
>
> (B) forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person . . . *Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing[.]

29 U.S.C. § 158(b)(4).

Midwest's argument again reads the statute too broadly. The Supreme Court has said:

> Whatever may have been said in Congress preceding the passage of the [Labor Management Relations Act of 1947, also known as the] Taft-Hartley Act concerning the evil of all forms of "secondary boycotts" and the desirability of outlawing them, it is clear that no such sweeping prohibition was in fact enacted in § 8(b)(4)(A). The section does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives.

*Loc. 1976, United Bhd. of Carpenters & Joiners of Am., A.F.L. v. N.L.R.B.*, 357 U.S. 93, 98 (1958).

Accordingly, Midwest must allege facts that show Defendants engaged in specific prohibited conduct and may not rely on generalized assertions of "secondary picketing." I conclude it has not done so.

Midwest's claim involves two groups: the Pilots and the international shipping companies which relied upon the Pilots to navigate their ships into Midwest's port. First, the Pilots.[2]

### a. The Pilots

As I noted above, Midwest alleges it was unlawful for Defendants and the Pilots to agree to "have the Pilots stop providing shipping services to the neutral shipping companies" when their ships arrived at or departed from Midwest's dock. (Doc. No. 64 at 9). Defendants contend Midwest has not stated a plausible claim for relief because it was not "unlawful . . . for Local 1982 to persuade or encourage the LPA . . . or the Pilots . . . to stop working for the international ships."

---

[2] Midwest alleges the Pilots "are self-employed independent contractors who run their own independent businesses . . . [and] are not 'employees.'" (Doc. No. 64 at 10).

7

(Doc. No. 75-1 at 19). Midwest responds it has stated a claim for violation of: (1) § 8(b)(4)(i) because "solicitations for cooperation are all that is needed to establish inducement or encouragement;" and (2) § 8(b)(4)(ii)(A) because its Second Amendment Complaint "plainly states, repeatedly, that the Defendants engaged in picketing and water picketing in an attempt to force the Pilots to stop providing shipping services to neutral shipping companies." (Doc. No. 81 at 8). Neither argument is persuasive.

Midwest fails to state a claim under § 8(b)(4)(i) because the Pilots do not fall within the scope of that provision. "[S]ubsection (i) is intended to encompass union pressure calculated to induce the employees of a secondary employer to withhold the services of their employment in order to force their employer to cease dealing with the primary employer." *Allied Mech. Servs., Inc. v. Loc. 337 of United Ass'n of Journeymen & Apprentices of Plumbing & Pipefitting Indus.*, 221 F.3d 1333 (Table), 2000 WL 924594, at *4 (6th Cir. 2000) (citing *N.L.R.B. v. Servette, Inc.*, 377 U.S. 46, 52-54 (1964)).

The current version of § 8(b)(4)(i) makes it "an unfair labor practice for a labor organization or its agents . . . to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services . . . ." 29 U.S.C. § 158(b)(4)(i). The statute originally included the phrase "employees of any employer," before it was amended in 1959 to use the current phrase "any individual employed by any person." *See Servette*, 377 U.S. at 52.

While Midwest argues this change means § 8(b)(4)(i) now broadly covers independent contractors as well, (Doc. No. 81 at 7-8), it is clear that the impact of this legislative change is far more limited. The Supreme Court has noted the switch from the phrase "employees of any

8

employer" to the phrase "any individual employed by any person" was designed to close a loophole by which "agricultural laborers, supervisors, and employees of an employer subject to the Railway Labor Act" were excluded from the reach of § 8(b)(4). *Servette*, 377 U.S. at 51-52. The 1959 amendments involved "[t]he careful creation of separate standards" through the division of § 8(d)(4) into subsections (i) and (ii) "differentiating the treatment of appeals to the employees of the secondary employer not to perform their employment services, from appeals for other ends which are attended by threats, coercion or restraint." *Id.* at 54.

Accordingly, § 8(b)(4)(i) is more limited in reach than Midwest portrays it to be, "prohibit[ing] inducement of . . . [employees] to withhold their services[3] <u>from their employer</u>." *Id.* at 54 (emphasis and alteration added); *see also N.L.R.B. v. Loc. 294, Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am.*, 298 F.2d 105, 107 (2d Cir. 1961) ("[I]nducements and encouragements . . . addressed to those in management far above the rank-and-file workers" do not constitute violations of Section 8(b)(4)(i).).

Midwest's proposed expansion of the term "any individual" to effectively cover anyone who provides a service for another person cannot support its own weight. Midwest has not plausibly alleged that the Pilots were "employed by" the international shipping companies and, therefore, it cannot show it is entitled to relief under § 8(b)(4)(i).

Its claim under § 8(b)(4)(ii)(B) fares no better. That subsection requires Midwest to show Defendants (a) threatened, coerced, or restrained any person engaged in commerce, (b) with a specific, prohibited secondary purpose. *See* 29 U.S.C. § 158(b)(4)(ii). Midwest argues it has alleged "the Defendants engaged in picketing and water picketing in an attempt to force the Pilots to stop

---

[3] "[T]he question of the applicability of subsection (i) turns upon whether the union's appeal is to cease performing employment services, or is an appeal for the exercise of managerial discretion." *N.L.R.B. v. Servette, Inc.*, 377 U.S. 46, 50 n.4 (1964)

9

providing shipping services to neutral shipping companies." (Doc. No. 81 at 8). But Midwest does not in fact allege Defendants forced, or tried to force, the Pilots not to board or dock the ships. Instead, Midwest alleges:

- To give an excuse and false appearance of legitimacy, per the express or implied agreement, ILA Local 1982 set up "pickets" about a mile away from the Midwest dock for the sole purpose to give the Pilots an excuse not to move the ships.

- LPA was in direct contact with ILA Local 1982, which coordinated their "picketing" to coincide with the refusal of the Independent Contractor Pilots from moving their ships in and out of the Midwest dock.

- [T]he so-called picket was the excuse [for the Pilot not to move a ship out of dock] even though nobody at Midwest, including the ILA members, recognized the picket as legitimate.

(Doc. No. 64 at 11-12, 17).

As Midwest acknowledges, the Second Amended Complaint does not contain any allegations of force or coercion other than "picketing." (Doc. No. 81 at 8-9). While Midwest contends allegations of picketing alone are sufficient to establish coercion under § 8(b)(4)(ii), (*see* Doc. No. 81 at 8), the true universe of conduct prohibited by that subsection is in actuality far more circumscribed. For example, "picketing which [takes] place around the situs of the primary employer – regardless of the special circumstances involved – [is not] invalid secondary activity under § 8(b)(4)(A)." *Loc. 761, Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO v. N.L.R.B.*, 366 U.S. 667, 676 (1961). The Supreme Court also has held "§ 8(b)(4)(ii)(B) does not prohibit all peaceful picketing at secondary sites." *N.L.R.B. v. Retail Store Emps. Union, Loc. 1001*, 447 U.S. 607, 611 (1980). In short, "Congress has never adopted a broad condemnation of peaceful picketing." *N.L.R.B. v. Fruit & Vegetable Packers & Warehousemen, Loc. 760*, 377 U.S. 58, 71 (1964) ("*Tree Fruits*").

Midwest's allegations, even when read in the light most favorable to Midwest, do not establish that Defendants threatened, coerced, or restrained the Pilots. As I discussed above with

10

respect to § 8(e), Midwest alleges Defendants asked the Pilots not to move ships in or out of Midwest's port, and the Pilots agreed. These allegations do not establish coercion.

Moreover, this is the claim (a voluntary agreement) of which Midwest gave Defendants "fair notice." *Erickson*, 551 U.S. at 93 (further citation omitted). While Midwest now characterizes its allegations as stating Defendants attempted to "force the Pilots to stop providing shipping services," (Doc. No. 81 at 8), that is not a fair reading of the Second Amended Complaint. Midwest cannot "amend [its] complaint in an opposition brief or ask the court to consider new allegations (or evidence) not contained in the complaint." *Bates v. Green Farms Condo. Ass'n*, 958 F.3d 470, 483 (6th Cir. 2020). Nor would Midwest's conclusory assertions of "force" permit it to state a plausible claim for relief with regard to the Pilots even if Midwest had sought to amend its complaint on the basis of those assertions.

### b. International shipping companies

That leaves the international shipping companies. Midwest argues "Count II . . . clearly sets forth a cause of action pursuant to 29 U.S.C. § 158(b)(4)(i) and (ii)(B) against the Defendants based upon their illegal secondary activity directed towards the neutral shipping companies and the customers whose cargo they were transporting." (Doc. No. 81 at 9).

These claims fall short as well. As I noted above, § 8(b)(4)(i) "prohibit[s] inducement of employees to withhold employment services," *Servette*, 377 U.S. at 54, and Midwest offers no reason to think the international shipping companies fit within that prohibition.

Midwest's claim under § 8(b)(4)(ii)(B) again rests on its allegations that Defendants engaged in picketing for the purpose of signaling to the Pilots that they should not bring ships in or out of Midwest's port. (*See* Doc. No. 64 at 21; Doc. No. 81 at 9). And again, the mere fact that Defendants engaged in picketing – whether real or "fake," as Midwest alleges, (*see, e.g.,* Doc. No. 64 at 11) – does not plausibly suggest that Defendants "threaten[ed], coerce[d], or restrain[ed] any

11

person." 29 U.S.C. § 158(b)(4)(ii)(B). "Picketing has traditionally been a major weapon to implement the goals of a strike and has characteristically been aimed at all those approaching the situs whose mission is selling, delivering or otherwise contributing to the operations which the strike is endeavoring to halt." *United Steelworkers of Am., AFL-CIO v. N.L.R.B.*, 376 U.S. 492, 499 (1964). Moreover, the Supreme Court's "decision in *Tree Fruits* . . . makes untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is 'coercion' within the meaning of § 8(b)(4)(ii)(B) . . . [simply because] it has some economic impact on the neutral." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 579 (1988) (emphasis in original).

Further, as Defendants argue, Midwest's claims rest on a theory of derivative liability – Defendants asked the Pilots, and the Pilots agreed, to do something which Defendants were not permitted to do themselves and, therefore, Defendants should be held liable. But Midwest offers no basis on which Defendants may be deemed to have undertaken the actions of an unaffiliated third party. The Second Amended Complaint does not include any allegations that the Pilots acted as Defendants' agents (rather than of their own volition) when they chose not to board the ships.

Claims under § 8(b)(4)(ii)(B) must plausibly allege both a conduct component and a purpose component. Midwest has not plausibly alleged Defendants engaged in prohibited conduct against the international shipping companies.

I conclude Midwest fails to state a claim for relief under §8(b)(4)(i) or § 8(b)(4)(ii)(B) and grant Defendants' motion to dismiss as to Count II.

### IV.    MOTION TO AMEND

Midwest seeks leave to file a Third Amended Complaint pursuant to Rules 15 and 21, which would add William Yockey, John D. Baker, John D. Baker, Jr., and Michael J. Baker as defendants and add a claim for violation of § 1 of the Sherman Antitrust Act. (Doc. No. 83). The GLDC and

12

Local 1982 filed a memorandum in opposition to Midwest's motion for leave to amend. (Doc. No. 88). Midwest filed a brief in reply. (Doc. No. 91). The ILA did not oppose the motion for leave but reserved its right to answer or otherwise respond to the Third Amended Complaint if leave is granted. (Doc. No. 86).

Midwest alleges:

> The ILA, ILA Great Lakes, ILA Local 1982, Baker, Baker Jr., M. Baker, Yockey, the LPA and the Pilots conspired or mutually assented to engage in concerted action whereby the Defendants would set up land and/or water pickets to signal to the Pilots to refuse their services to the international shipping companies to dock or undock the ship from Midwest's facility.

(Doc. No. 83-1 at 23).

This conspiracy allegation is not quite what it seems at first blush. Midwest's allegations establish the three ILA Defendants and the four proposed individual defendants (all of whom are or were ILA officers) constitute only one enterprise:

- As Trustees, Yockey and M. Baker controlled ILA Local 1982.

- They acted as agents of the ILA and the ILA Great Lakes who oversaw . . . [and] control[led] the actions of ILA Local 1982. . . .

- In 2017, ILA Local 1982 – under the direction and control of Yockey and M. Baker – changed its tactics. Specifically, on or about April 25, 2017, the Defendants [began] a plan of action against the Shipping Companies who were delivering cargo to Midwest facility.

(Doc. No. 64 at 7, 9).

For claims under § 1 of the Sherman Antitrust Act, "the relevant inquiry . . . is whether there is a contract, combination . . ., or conspiracy amongst <u>separate economic actors pursuing separate economic interests</u> . . . ." *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 195 (2010) (citation and internal quotation marks omitted) (emphasis added). "The question is whether the agreement joins together 'independent centers of decisionmaking.'" *Id.* at 196 (quoting *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984)). Just as § 1 does not cover the agreements of a president and

13

vice president of a firm to act together, or the "'coordinated activity of a parent and its wholly owned subsidiary,'" *Am. Needle*, 560 U.S. at 196 (quoting *Copperweld*, 467 U.S. at 771), it does not cover circumstances like these where the same individuals allegedly make decisions on behalf of multiple entities. Thus, while Midwest implies it is alleging an actionable conspiracy among nine separate individuals, groups, and entities, Midwest's proposed antitrust claim substantively involves an alleged anticompetitive agreement between, on one hand, the ILA parties and, on the other, the LPA and the Pilots.[4] (*See also* Doc. No. 62 at 8).

Rule 21 permits a court to add a party to an action "at any time, on just terms." Fed. R. Civ. P. 21. Rule 21 does not provide any context for what constitutes "just terms," leading many courts to analyze Rule 21 motions to add parties under Rule 20(a)(2), which permits parties to "be joined in one action as defendants if:

(A) any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and

(B) any question of law or fact common to all defendants will arise in the action."

Fed. R. Civ. P. 20(a)(2); *see, e.g., Goode v. City of Southaven*, No. 16-2029, 2016 WL 11607743, at *4 (W.D. Tenn. June 29, 2016) (citing cases). "[M]uch like Rule 15(a), the requirements prescribed by Rule 20(a) are to be liberally construed in the interest of convenience and judicial economy." *Gray Constr., Inc. v. Envirotech Constr. Corp.*, No. 5: 17-484-DCR, 2018 WL 3341182, at *2 (E.D. Ky. July 6, 2018) (citation omitted).

---

[4] Midwest has not sought leave to add the LPA or the Pilots as defendants. Midwest previously asserted tort claims against the LPA and the Pilots based upon the same events as are at issue in this case, before dismissing those claims with prejudice. (*See Midwest Terminals of Toledo Int'l, Inc. v. Lake Pilots Ass'n*, No. 3:18-cv-1286, Doc. Nos. 1-3 and 35). The absence of those parties from this litigation is not fatal to Midwest's proposed claim, as an alleged antitrust coconspirator is not an indispensable party. *See Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 330 (1955).

14

Rule 15 provides "a party may amend its pleading only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. Pro. 15(a)(2). "In the absence of any apparent or declared reason – such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. – the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182 (1962); *see also Head v. Jellico Hous. Auth.*, 870 F.2d 1117, 1123 (6th Cir. 1989).

"Notice and substantial prejudice to the opposing party are critical factors in determining whether an amendment should be granted." *Hageman v. Signal L. P. Gas, Inc.*, 486 F.2d 479, 484 (6th Cir. 1973). Delay alone is not enough permit a court to deny a motion to amend, regardless of how long a party has delayed. *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 888 (6th Cir. 1990) (A party opposing a motion to amend must offer "at least some significant showing of prejudice.") (quoting *Moore v. City of Paducah*, 790 F.2d 557, 562 (6th Cir. 1986) (per curiam)).

Midwest argues it should be granted leave to amend because:

> Defendants would not have to expend significant additional resources to conduct discovery and prepare for trial nor would the additional claim significantly delay the resolution of the dispute because the parties are still engaged in paper discovery. Further, the amendment would not make this case overly complex and confusing nor can the defendants objectively argue that, up until this point in litigation, they would have conducted their defense in a significantly different manner had the amendment been proposed earlier. Also, the Defendants cannot argue that Plaintiff's proposed amendment would be futile.

(Doc. No. 83 at 6). Further, Midwest contends, "Plaintiff's proposed amendment results from the arguments Defendants put forth in their Motions to Dismiss." (*Id.*).

The GLDC and Local 1982 argue I should deny Midwest's motion because it would result in substantial prejudice and further delay the case. (Doc. No. 88 at 5). They also argue Midwest has shown "a complete lack of diligence" in moving to amend because it had "access to all of the

15

relevant documents and evidence necessary to support its alleged Sherman Antitrust Act violations for nearly fifteen (15) months." (*Id.*).

While delay alone is an insufficient basis to deny Midwest's motion, it is useful to note that Midwest did not dispute the assertion that it had "the relevant documents and evidence" for over 15 months. (*See* Doc. No. 91). While Midwest argues its proposed amendment "results from" Defendants' arguments in the motions to dismiss, (Doc. No. 83 at 6), Defendants did not introduce new facts or allegations into the case through their briefing. They simply summarized the allegations Midwest already had made.

Moreover, Midwest cannot claim surprise that Defendants described Midwest's allegations this way in their motions to dismiss. Midwest itself, acting through its counsel of record in this case, did so nearly three years earlier, repeatedly referring to the alleged agreement between the LPA and the ILA as "collusion." (*Midwest Terminals of Toledo Int'l, Inc. v. Lake Pilots Ass'n*, No. 3:18-cv-1286, Doc. No. 1-3 at 8-10 (Nov. 6, 2018)). As antitrust conspiracies "are rarely explicit agreements," allegations that a defendant colluded with another party for an unlawful reason are commonplace in antitrust claims. *Weber v. Nat'l Football League*, 112 F. Supp. 2d 667, 671-72 (N.D. Ohio 2000).

While the factual allegations may be largely the same, Midwest's proposed causes of action are not. The GLDC and Local 1982 argue they will suffer prejudice due to:

> (i) legal research that will need to be done by all Defendants relative to the alleged Sherman Antitrust Act claims, including applicable defenses and case law relating to the same; (ii) additional discovery that Local 1982 and the GLDC will need to engage in with respect to the Sherman Antitrust Act claims, especially given that written discovery has been completed for nearly seven (7) months at this point; and (iii) further delays to the underlying action, which has been pending since November 6, 2018, resulting from Midwest's addition of four (4) Personal Defendants.

(Doc. No. 88 at 8).

While Midwest asserts the GLDC and Local 1982 have "failed to illustrate what type of additional discovery [they] could possibly need that differentiates from that which [they] already

16

requested," (Doc. No. 91 at 7), it is well-recognized that antitrust discovery is different in kind from the discovery involved in other types of claims. *See Twombly*, 550 U.S. at 558 ("[I]t is one thing to be cautious before dismissing an antitrust complaint in advance of discovery . . . but quite another to forget that proceeding to antitrust discovery can be expensive.") (internal citation omitted). *See also id.* at 558-59 (citing Note, Modeling the Effect of One–Way Fee Shifting on Discovery Abuse in Private Antitrust Litigation, 78 N.Y. & U. L. Rev. 1887, 1898-99 (2003), for its discussion of "the unusually high cost of discovery in antitrust cases," and Manual for Complex Litigation, Fourth, § 30, p. 519 (2004), for its description of the "extensive scope of discovery in antitrust cases").

I conclude the GLDC and Local 1982 have established that granting Midwest leave to file a Third Amended Complaint to add the proposed antitrust claim and defendants at this stage of the litigation – after one earlier round of briefing on Midwest's motion for leave to file a Second Amended Complaint, extensive briefing on the Defendants' motions to dismiss the Second Amended Complaint, and the exchange of extensive written discovery between Midwest, the GLDC, and Local 1982 – would cause significant prejudice to the current and proposed Defendants. Therefore, I deny Midwest's motion for leave to amend. (Doc. No. 83).

## V.  CONCLUSION

For the reasons stated above, I grant the ILA's motion to strike Midwest's attorney fees demand, (Doc. No. 76), and Defendants' motions to dismiss the Second Amended Complaint. (Doc. Nos. 75 and 77). I deny Midwest's motion for leave to file a Third Amended Complaint. (Doc. No. 83).

So Ordered.

s/ Jeffrey J. Helmick
United States District Judge

17